

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DEVON JAMAL TOWNSEND,

    Plaintiff,

    v.

C.O. II AMY CONNELL,
CO II JOHN MOST,
LT. JAMES SMITH,
C.O. II BRADLEY RITCHIE,
C.O. II LANE BUTERBAUGH,
C.O. II. JOSHUA HENRY,                    Civil Action No. TDC-19-2803
C.O. II DANIEL FRENZEL,
C.O. II JUSTIN BROOKS,
C.O. II HARRY CARR,
WILLIAM LOGSDON,
SGT. FLOYD BENSON and
HEARING OFFICER JAMIE FARRIS,

    Defendants.

## MEMORANDUM OPINION

Plaintiff Devon Jamal Townsend, an inmate at the Western Correctional Institution ("WCI") in Cumberland, Maryland, has filed a Complaint under 42 U.S.C. § 1983 against Correctional Officer ("C.O.") II Amy Connell, C.O. II John Most, Lt. James Smith, C.O. II Bradley Ritchie, C.O. II Lane Buterbaugh, C.O. II Joshua Henry, C.O. II Daniel Frenzel, C.O. II Justin Brooks, C.O. II Harry Carr, William Logsdon, Sgt. Floyd Benson, and Hearing Officer Jamie Farris in which he alleges excessive force and deprivation of medical care in violation of the Eighth Amendment to the United States Constitution, and a denial of his due process rights in violation of the Fourteenth Amendment. Defendants have filed a Motion for Summary Judgment, which is fully briefed. ECF No. 83. Having reviewed the submitted materials, the Court finds that no

hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Prior relevant factual background and procedural history is set forth in the Court's May 11, 2021 Memorandum Opinion on Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, which is incorporated by reference. *Townsend v. Dep't of Pub. Safety and Corr. Servs.*, ("*Townsend I*"), No. TDC-19-2803, 2021 WL 1893193 (D. Md. May 11, 2021). Additional facts and procedural history are provided below as necessary.

**I.     April 28, 2019 Incident**

On April 28, 2019 at approximately 6:00 p.m., shortly after inmates were let out for recreation, water from the area of the toilet started to flood into Plaintiff Devon Jamal Townsend's cell in Housing Unit 2 at WCI. When Townsend returned to his cell, C.O. II Bradley Ritchie, C.O. II John Most, and C.O. II Amy Connell had arrived to help address the flooding. Townsend requested that Ritchie open the cell door so that he could retrieve his belongings on the floor so they would not be damaged by the water. Ritchie refused and told Townsend to return to the recreation hall, but Townsend did not comply and said that his personal property was being destroyed. After Townsend continued to refuse to return to the recreation hall, Ritchie handcuffed Townsend with his hands behind his back. According to Ritchie, Townsend resisted by not immediately placing his arms behind his back. Townsend's legs were not restrained. Ritchie, Most, and Connell then took Townsend to "lock-up," or disciplinary segregation, in Housing Unit 4. Joint Appendix ("J.A.") 74, ECF No. 87. While he was escorted to Housing Unit 4, Townsend used vulgar language, but he did not physically resist. According to Townsend, during this escort, Connell repeatedly threatened to pepper spray him even though he was handcuffed and compliant.

2

Ritchie, Most, and Connell brought Townsend into Housing Unit 4 through Door No. 430A, a side door, and turned Townsend over to three Housing Unit 4 officers.  Inside of Door No. 430A is a property room with a "strip cage," in which officers strip down inmates to ensure that they do not have any weapons before they are placed in lock-up.  Although the outside of Door No. 430A can be seen on a security camera, the area inside Door No. 430A, including the area between the door and the strip cage, is not covered by any security cameras, a fact known to many correctional officers.

According to Ritchie, Most, and Connell, once they turned Townsend over to the Housing Unit 4 officers, whose names they could not remember, they all left the area and returned to Housing Unit 2.  In contrast, Townsend asserts that when he entered Housing Unit 4, Most pushed his face against the wall and Ritchie punched him.  Townsend states that he was then thrown to the ground and that Ritchie, Most, Connell, C.O. II Justin Brooks, and C.O. II Harry Carr punched and kicked Townsend in his sides, back and stomach.  Townsend states that officers dragged him into the nearby property room, where Ritchie, Most, Connell, and Brooks continued to punch and kick him in his sides, back, and stomach.  According to Townsend, at that point, C.O. Daniel Frenzel dragged Townsend into the strip cage, slammed his head against the back wall of the cage twice, and taunted Townsend to "do something."  J.A. 643.  C.O. II Lane Buterbaugh then "emptied his fogger of pepper spray" in Townsend's face.  *Id.*

C.O. II Joshua Henry and Frenzel acknowledge that they were two of the Housing Unit 4 officers who received Townsend at Door No. 430A, and they recall that Buterbaugh was also with them.  Henry stated in his deposition that when he arrived at Door No. 430A, Ritchie and two or three other officers were pressing Townsend, who was still handcuffed, up against the wall to secure him.  Henry asserts that at that point, Townsend was yelling, jerking his body around,

3

pulling away from the officers, and kicking.  According to Henry, he and Frenzel put their arms around Townsend's arms to escort him to the strip cage, while Buterbaugh also attempted to keep Townsend under control.  Henry states that as they were moving Townsend from Door No. 430A to the strip cage, Townsend kicked Buterbaugh in the shin, and Henry, Frenzel, and Townsend "ended up on the floor." J.A. 175.  Townsend denies that he kicked Buterbaugh.  Frenzel asserts that they fell to the ground because he tripped over someone's feet.  At that point, while Townsend remained handcuffed, Buterbaugh used a significant quantity of pepper spray on Townsend.  According to Henry, the officers had "no further issues" with Townsend, who then stopped resisting and walked into the strip cage. J.A. 176.  He and Frenzel both assert that after locking Townsend in the strip cage, they left the area.  For his part, Buterbaugh stated in his deposition that he has no recollection of any interactions with Townsend that day, including that he does not remember being kicked by Townsend or using pepper spray on him.

According to Brooks and Carr, they did not arrive on the scene until after Townsend had already been placed in the strip cage, and they have both denied witnessing or participating in any physical altercation with Townsend.  Carr could tell that Townsend had been pepper sprayed based on the odor and because he could see an orange stain on his clothing.

## II.    Medical Care

According to Townsend, as a result of the beating he sustained, he had pain in his left rib cage and believed that he had fractured ribs.  He also had tearing in his eyes, pain on his skin, eyes, and throat, and difficulty breathing as a result of the pepper spraying.  At 7:10 p.m., after Townsend was pepper sprayed, the officers took him to see a nurse.  According to medical records, Nurse Sheryl Bittinger took Townsend's vital signs and noted that his breathing sounded clear.  Because Townsend complained of rib pain, the nurse also conducted a visual inspection of Townsend's

4

chest, left rib area, arms, and hands, and she concluded that they were free of injury or redness or other discoloration. Townsend, however, maintains that the nurse did not actually lift up or remove his shirt in order to examine his rib area. Nevertheless, the nurse released Townsend back to the custody of the correctional officers and noted that no follow up was necessary.

From April 29, 2019 until May 1, 2019, Townsend was placed on "staff alert," which is a status for inmates who threaten or harm a staff member and need to have their behavior monitored. J.A. 412. An inmate on staff alert is placed in a holding cell and is unable to submit written sick call requests because such an inmate is not permitted to have a pen. Instead, an inmate on staff alert would have to request medical treatment through the correctional officers on duty.

According to Townsend, while he was on staff alert, he informed Sgt. Floyd Benson and Lt. James Smith that he was in extreme pain and requested multiple times that they help him obtain medical care. Townsend asserts that at the time, he was wincing whenever he stood up or moved, held his rib area due to the pain, and was breathing in short, gasping breaths because of the pain. Neither Benson nor Smith arranged for Townsend to see a medical provider. Rather, Benson has testified that he does not recall any request for medical attention and that if an inmate asked for medical assistance, he would have called the medical unit. Likewise, Smith has testified that if Townsend had told him that he believed that his ribs were broken, he probably would have called the medical unit.

On May 1, May 4, and May 9, 2019, after he was taken off of staff alert status, Townsend submitted sick call request forms stating that he believed that his ribs were broken during an assault by correctional officers and requesting an x-ray or other medical attention. On May 9, 2019, Townsend was examined by Nurse Dennis Martin and reported discomfort in his left rib area. Nurse Martin, however, noted in medical records that Townsend was "able to walk, stand and get

5

on and off [the] exam table with no signs or symptoms of discomfort," J.A. 367, and that he examined Townsend's chest and back and noted no redness, swelling, bruising, or open areas and found that his lungs were clear. He also found no swelling or bruising in the left rib cage area, detected no symptoms of pain when he touched that area, and observed that Townsend also had a full range of motion in all his extremities.

Townsend submitted additional sick call requests on May 12, May 15, and May 19, 2019, again requesting an x-ray of his ribs because he was in pain and believed that he had broken ribs. On May 22, 2019 at 9:35 a.m., Townsend was examined by Nurse William Raynor, who noted that Townsend did not appear to have difficulty breathing, that he was able to get onto and off of the examination table without difficulty, and that there were no observable injuries in his chest and abdomen areas. The nurse also felt Townsend's rib area and concluded that his ribs appeared to be intact without any cracks or raised areas. On June 10, 2019, after Townsend again complained of rib pain during another medical visit, another nurse ordered an x-ray of Townsend's ribs. The x-ray, which was performed on June 14, 2019, found no evidence of a fracture or dislocation of Townsend's left-side ribs.

In subsequent medical visits, Townsend continued to report issues with his left rib area. On August 3, 2019, a nurse noted firmness and swelling in Townsend's left lower rib area. On August 8, 2019, a doctor noted that Townsend's left side was slightly prominent but that there was no palpable mass and no pain associated with it. The doctor stated that there could be a hematoma in Townsend's left side and recommended that Townsend make an appointment in a couple of months if it did not go away. On August 22, 2019, a nurse examining Townsend based on his continuing complaint of rib pain noted that Townsend's left lower rib area had a "[s]mall palpable area of inflammation" but that Townsend did not appear to be in acute distress. J.A. 385. On

January 11, 2020, a nurse noted that there was a "palpable mass about the size of a quarter" in Townsend's left rib area.  J.A. 678.  Finally, on March 19, 2020, a nurse noted a small lump on Townsend's left rib cage but no swelling.

## III.    Disciplinary Proceedings

### A.    Ritchie Notice of Inmate Rule Violation

On May 1, 2019, in connection with the April 28, 2019 incident, Townsend received a copy of a Notice of Inmate Rule Violation ("NOIRV") filed by Ritchie (the "Ritchie NOIRV"), which charged Townsend with interference with a search, disobeying an order, and demonstrating disrespect.  On May 9, 2019, Townsend attended a hearing on the Ritchie NOIRV before Hearing Officer Jamie Farris and was found guilty of disobeying an order and of demonstrating disrespect but not guilty of interfering with a search.  Townsend was sanctioned with 45 days of segregation and revocation of 60 days of good time credits in relation to the charge of disobeying an order.

### B.    Buterbaugh Notice of Inmate Rule Violation

On May 1, 2019, in connection with the April 28, 2019 incident, Townsend also received a copy of an NOIRV filed by Buterbaugh (the "Buterbaugh NOIRV"), which charged Townsend with assaulting an officer and disobeying an order based on the allegation that Townsend kicked Buterbaugh in the leg.  For his hearing on the Buterbaugh NOIRV, Townsend requested that Ritchie, Frenzel, Buterbaugh, Brooks, and Carr appear as witnesses.  Although the hearing on the Buterbaugh NOIRV was originally scheduled for May 9, 2019, Farris, who presided over the hearing, postponed it to May 22, 2019 because the witnesses sought by Townsend were not available.  As it turns out, C.O. II William Logsdon, who was the WCI adjustment coordinator responsible for securing the attendance of witnesses at hearings, failed to notify these witnesses that they were to appear at the hearing.

7

On May 22, 2019 at approximately 9:00 a.m., a correctional officer arrived at Townsend's cell and took him to the medical unit for an examination by Nurse Raynor. Townsend was examined at 9:36 a.m. and returned to his cell after 10:00 a.m. At 10:30 a.m., Townsend was served with a Notice of Inmate Hearing Record relating to the May 22, 2019 hearing. The Notice stated that the hearing had been held *in absentia* based on a waiver by Townsend of his right to appear. At the hearing, Logsdon had submitted a "Waiver of Appearance" form stating that Townsend had informed Henry that he "wished to waive an appearance before the hearing officer." J.A. 576. The Waiver of Appearance form was signed by Henry at 9:00 a.m. on May 22, 2019 but not by Townsend. In the form, Henry stated that Townsend had refused to sign the form and had stated, "Do what you want. I don't care." *Id.*

At the hearing, Farris found Townsend guilty of committing assault or battery on staff and not guilty of disobeying an order. Townsend was sanctioned with 60 days of segregation and revocation of 60 days of good time credits.

## IV.     Administrative Proceedings

On May 1, 2019, Townsend filed an Administrative Remedy Procedure complaint ("ARP"), ARP No. WCI-0948-19, relating to the April 28, 2019 incident. Townsend alleged that after being handcuffed, he was physically kicked and punched in the stomach and rib cage area by Buterbaugh, Frenzel, Brooks, and Carr and pepper sprayed by Buterbaugh without justification. He asserted that the officers deliberately assaulted him in a location without cameras and in a manner that would not leave visible injuries. He asserted that he believed that his ribs were cracked and alleged that his repeated requests for medical assistance were being ignored. Townsend specifically requested that all available video footage be reviewed to show that he was in handcuffs at the time of the assault. On May 30, 2019, ARP No. WCI 0948-19 was dismissed because the

8

case was being investigated by the Intelligence and Investigative Division ("IID"). Although Townsend appealed the dismissal to the Commissioner of Correction, the Commissioner dismissed Townsend's appeal on June 26, 2019 again because of the IID investigation.

On May 15, 2019, Townsend submitted a second ARP, No. WCI 0847-19, in which he complained that nurses were ignoring his requests for medical treatment for his injuries from the April 28, 2019 assault. Specifically, he asserted that the nurses who saw him on the night of the incident did not address his complaints of rib pain, and that beginning on April 29, 2019, while he was on staff alert, he asked for help from four different nurses while they were in his housing unit but they declined to arrange for medical care. He also complained that his multiple sick call requests beginning on May 1, 2019 and other requests he made to nurses did not result in any medical treatment. He acknowledged that he was finally seen by a nurse on May 9, 2019, when Lt. Smith arranged for a medical visit after Townsend had sent a letter to the Warden, but he asserted that he had not yet received an x-ray. On June 7, 2019, ARP No. WCI 0874-19 was found to be "meritorious in part" because the sick call requests were not addressed in a timely manner. J.A. 441. The resolution of the ARP was that management would "be educated on the limited staff numbers and the need to hire additional staff to ensure adequate medical care is being provided," and that the onsite scheduler would "be educated on the importance of scheduling sick calls within the established timeframe." *Id.* Townsend does not dispute that he did not appeal this determination.

On June 1, 2019, Townsend filed an appeal of the results of his May 22, 2019 hearing on the Buterbaugh NOIRV to the Warden's office. In his appeal, Townsend asserted that he was denied due process because no one came to his cell to take him to the May 22, 2019 hearing and that he was instead taken to the medical unit for a sick call. He maintained that he had requested

9

witnesses for the hearing.  On June 11, 2019, the hearing officer's decision was affirmed, and Townsend received a copy of the Warden's decision on June 20, 2019.  On June 23, 2019, Townsend filed an appeal with the Inmate Grievance Office ("IGO"), in which he denied that he had waived his right to appear at the hearing, asserted that the waiver form was falsified, and stated that surveillance video footage from his housing unit would show that the only officer who came to his unit that morning was the officer who escorted him to the medical unit.  The IGO appeal, No. 2019-1974, was received by the IGO on August 5, 2019, and Townsend never received a decision from IGO.

On December 17, 2019, Robin Woolford, the Deputy Director of the IGO, sent an email to Kimberly Stewart, the Chief Hearing Officer of the Office of Inmate Hearings.  In the email, Woolford noted that Townsend's May 9 and May 22 hearings, based on the Ritchie NOIRV and the Buterbaugh NOIRV, respectively, stemmed from the same event.  Woolford also stated that she believed that she would have to set a hearing on Townsend's appeal but wanted Stewart's help "to straighten this out" before she did so.  J.A. 617.  On December 20, 2019, Stewart issued a memorandum purporting to resolve an appeal of the Ritchie NOIRV in which she stated that because the Ritchie NOIRV and the Buterbaugh NOIRV stemmed from the same incident, they normally would have been merged.  Because the most serious violation, for assaulting an officer, arose in the Buterbaugh NOIRV, and based on the mistaken understanding that Townsend had pleaded guilty to that offense, Stewart ordered that Townsend's conviction from the Ritchie NOIRV be reversed, and that the sanctions of 45 days of segregation and loss of 60 days of good time credits be vacated.  On December 23, 2019, however, Woolford sent an email to Stewart noting that Townsend had not pleaded guilty to the charges in the Buterbaugh NOIRV and instead

10

had been found guilty *in absentia*, and that his appeal had been of the Buterbaugh NOIRV, not the Ritchie NOIRV.

On December 31, 2019, Logsdon asked Townsend to sign a Notice of Withdrawal form, addressed to Stewart, which states, "I, Devon Townsend, DOC No. 362788, hereby wish to withdraw my grievance in IGO Case No. 2019-1074." J.A. 640. According to Townsend, Logsdon advised him that by signing the Notice of Withdrawal form, he would be confirming that he had received paperwork informing him that the Ritchie NOIRV had been "overturned and merged" with the Buterbaugh NOIRV. J.A. 645. Relying on this representation, Townsend signed the Notice of Withdrawal, which was then submitted to Stewart. In turn, Stewart informed Woolford by email that "Despite my mix up, [Townsend] accepted the resolution in the memo" and sent her a copy of the Notice of Withdrawal. J.A. 616. Based on the Notice of Withdrawal, Woolford administratively dismissed IGO No. 2019-1074 on January 15, 2020 and sent a letter to Townsend to notify him of the dismissal. Townsend asserts that he was misled by Logsdon's explanation of the purpose of the Notice of Withdrawal and that he never intended to withdraw his IGO appeal of the conviction on the Buterbaugh NOIRV. He asserts that he first learned that his signing of the Notice constituted a withdrawal of that appeal at his deposition on May 26, 2022.

## V.    Procedural History

On September 18, 2019, Townsend filed the present civil action. The presently operative Amended Complaint, filed on August 22, 2022, alleges the following causes of action pursuant to 42 U.S.C. § 1983. In Count 1, Townsend alleges excessive force in violation of the Eighth Amendment against Ritchie, Most, Connell, Henry, Frenzel, Buterbaugh, Brooks, and Carr based on the alleged beating and pepper spraying on April 28, 2019. In Count 2, Townsend alleges deliberate indifference to a serious medical need, in violation of the Eighth Amendment, against

11

Benson and Smith for failing to respond to Townsend's requests for medical care when Townsend was on staff alert status. In Count 3, Townsend alleges violations of his due process rights under the Fourteenth Amendment against Logsdon, Farris, and Henry based on the claim that they prevented him from attending his May 22, 2019 hearing on the Buterbaugh NOIRV that resulted in the imposition of sanctions of 60 days of disciplinary segregation and the loss of 60 days of good conduct credits.

## DISCUSSION

In their Motion, Defendants seek summary judgment on all claims on the grounds that: (1) Townsend failed to exhaust administrative remedies; (2) the record evidence is insufficient to establish any of Townsend's claims; and (3) Defendants are entitled to qualified immunity.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

12

## II.    Exhaustion of Administrative Remedies

Although they did not assert a defense of failure to exhaust administrative remedies in the first dispositive motion, Defendants argue that Townsend's claims fail because he has not pursued and completed all administrative review processes available. In response, Townsend argues that Defendants have waived this defense by not asserting it earlier and that, even if subject to consideration, the argument fails because he exhausted all available administrative remedies.

Under the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134 § 803, 110 Stat. 1321 (1996) (codified as amended at 42 U.S.C. § 1997e(a)):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2018). Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion is mandatory and generally may not be excused unless the administrative procedure is not available. *See Ross v. Blake*, 578 U.S. 632, 642 (2016) (holding that "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross*, the United States Supreme Court identified three circumstances when an administrative remedy is unavailable: when officers are "unable or consistently unwilling to provide any relief to aggrieved inmates," when the procedure is "so opaque that it becomes, practically speaking, incapable of use," or when "prison administrators thwart inmates from taking

advantage of [filing grievances] through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44.

### A.   Waiver

As an initial matter, Townsend argues that Defendants waived their administrative exhaustion defense by failing to file an Answer to the Amended Complaint, which was filed on August 22, 2022, and instead moving straight to the present Motion for Summary Judgment, which was filed on September 20, 2022.  "[F]ailure to exhaust is an affirmative defense." *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Although affirmative defenses are generally "waived unless asserted" in a pleading, "waiver is not automatic" and requires "a showing of prejudice or unfair surprise." *See Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1164 (4th Cir. 1985).

In the Answer to Townsend's original Complaint, Defendants asserted the affirmative defense of failure to exhaust administrative remedies.  This Answer was filed on June 22, 2021, more than one year before Defendants filed their Motion for Summary Judgment.  Townsend was therefore on notice of this defense well before the filing of Defendants' Motion for Summary Judgment.  Moreover, the Court notes that in its August 22, 2022 Order granting Townsend's Motion for Leave to File the First Amended Complaint, at a time when a briefing schedule on the Motion for Summary Judgment had already been set, the Court did not set a specific deadline for Defendants to file an Answer to Townsend's Amended Complaint.  ECF No. 75.   When Defendants realized they did not file an Answer, they requested and received an extension of time to do so and filed their Answer to Townsend's Amended Complaint on December 9, 2022, while the Motion for Summary Judgment was pending, and again asserted the affirmative defense of failure to exhaust administrative remedies.  ECF Nos. 92, 94.  Under these circumstances, where Defendants had asserted this defense in the Answer to the original Complaint, the Court permitted

14

the filing of an Answer to the Amended Complaint after the filing of the Motion for Summary Judgment, and Townsend has not shown prejudice or unfair surprise, the Court finds that Defendants have not waived this affirmative defense.

### B.    Eighth Amendment Claims

On the Eighth Amendment claims, Defendants argue that Townsend did not fully exhaust the prison administrative complaint process on both the excessive force and medical care claims. In Maryland prisons, for these types of grievances, the Administrative Remedy Procedure is the administrative process that must be exhausted. Md. Code Regs. § 12.02.28.02(B)(1), (D) (2022). First, a prisoner must file an ARP with the warden within 30 days of the incident at issue. *Id.* § 12.02.28.05(D)(1) (requiring filing with the "managing official"); *id.* § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); *id.* § 12.02.28.09(B) (setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. *Id.* § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the IGO. *See* Md. Code. Ann., Corr. Servs. §§ 10–206, 10–210 (LexisNexis 2017); Md. Code Regs. § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in the appropriate Maryland Circuit Court. *See* Md. Code Ann., Corr. Servs. § 10–210(a).

As discussed above, on May 1, 2019, Townsend submitted ARP No. WCI-0948-19 in which he complained about the alleged assault by correctional officers on April 28, 2019. In the ARP, he also asserted that "I have complained to multiple medical staff about my ribs hurting . . . and have not received proper medical assistance," that "I am currently still being ignored," and that "I knew for sure that my ribs are cracked and medical is refusing to x-ray me to see what's

15

wrong with my insides." J.A. 556. In response, the Warden dismissed the ARP because of a pending IID investigation. Townsend appealed this dismissal to the Commissioner of Correction, who again dismissed Townsend's ARP because of the pending IID investigation. Townsend has not claimed that he further appealed to the IGO, as is typically required by the ARP process.

In *Ross,* the Supreme Court specifically identified the practice in the Maryland correctional system of dismissing ARPs because of a pending Internal Investigative Unit ("IIU") investigation, now known as an IID investigation, as a practice that arguably thwarted a prisoner's ability to use the ARP process and remanded for a determination of whether the prisoner plaintiff had an "available" administrative remedy in light of this practice. *Ross*, 578 U.S. at 647–48. Since *Ross*, judges in this District have held on multiple occasions that "an IID investigation renders claims either exhausted or unavailable." *Hinton v. Chronister*, No. GJH-19-3334, 2021 WL 2207425, at *6–7 (D. Md. May 31, 2021) (denying summary judgment based on the defense of failure to exhaust administrative remedies based on the denial of an ARP appeal because of an ongoing IID investigation); *Oakes v. Dep't of Pub. Safety*, No. GLR-14-2002, 2016 WL 6822470, at *4–5 (D. Md. Nov. 18, 2016) (finding that "an II[D] investigation renders administrative remedies unavailable"); *Brightwell v. Hershberger*, No. DKC-11-3278, 2016 WL 4537766, at *9 (D. Md. Aug. 31, 2016) (stating that the plaintiff "met his burden to exhaust upon the initiation of [the IIU] investigation" because "the existence of an IIU investigation shuts down the ARP process and thus exhausts administrative remedies for complaints that would typically fall within the ARP jurisdiction"). The Court therefore finds that the failure to appeal the ARP to the IGO does not bar Townsend's Eighth Amendment claims because the ARP process is effectively unavailable when the ARP is dismissed because of a pending IID investigation.

The Court, however, finds that Townsend did not exhaust administrative remedies as to his claim that Benson and Smith failed to arrange for him to receive medical treatment during the time he was on staff alert status. ARP No. WCI-0948-19, while registering a complaint about the medical staff's failure to provide him with appropriate medical treatment, including an x-ray, never asserts that any correctional officers failed to convey requests for medical attention to the medical staff. Likewise, although Townsend filed a second ARP, ARP No. WCI-0847-19, to register complaints about the failure to provide medical treatment, he again complained only about nurses to whom he made verbal requests for treatment and other medical staff who did not provide timely medical care. Moreover, while that ARP was deemed meritorious in part with the limited result that medical staff would be advised to provide faster service, to the extent that Townsend was dissatisfied with the resolution, he needed to appeal that determination to the Commissioner of Correction and the IGO, which he did not.

At no point in the administrative process did he assert that correctional officers were violating his rights by failing to pass on requests for medical care. This distinction is significant because the correctional officers and medical staff are employed by different entities and thus need to be separately identified in any such complaint. Under these circumstances, the Court finds a failure to exhaust administrative remedies on the claim in Count 2 against correctional officers for deliberate indifference to a serious medical need.

### C.    Due Process Claims

As to Townsend's due process claim, the ARP process does not apply to disciplinary proceedings resulting in the loss of good conduct credits. Md. Code Regs. §§ 12.03.01.30(A)(2), 12.03.01.30(C). Rather, there is a separate, formal appeal process for such determinations that requires the filing of a written appeal with the "Managing official of the facility" and then a second

appeal to the IGO. *See id.* Townsend appealed the hearing officer's decision on the Buterbaugh NOIRV, then appealed the Warden's denial of his appeal to the IGO, but never received a decision on that appeal. In arguing that Townsend failed to exhaust this administrative process, Defendants rely on the Notice of Withdrawal form signed by Townsend on December 31, 2019, in which he agreed to withdraw IGO No. 2019-1074, the appeal of the decision on the Buterbaugh NOIRV. Townsend argues that his failure to complete the appeal process should be excused because his agreement to withdraw the IGO appeal was based on a misrepresentation by Logsdon, who informed him that his signing of the Notice would constitute an acknowledgment that sanctions associated with the Ritchie NOIRV were invalid and would be merged with the sanctions associated with the Buterbaugh NOIRV, not that he was giving up his right to a determination on his appeal of the ruling on the Buterbaugh NOIRV.

Under *Ross*, one exception to the requirement of exhaustion of administrative remedies is when those remedies are "unavailable" because prison administrators thwarted the prisoner's ability to take advantage of the administrative process "through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44. Although ordinarily a claim of a misrepresentation by prison officials would be viewed with skepticism where the prisoner signed a withdrawal form, in this instance the record provides a legitimate basis to conclude that Townsend signed the form based on misrepresented facts. Townsend's claim that Logsdon told him that the purpose of the form was to confirm the withdrawal of the sanctions on the Ritchie NOIRV is partially corroborated by the memorandum by Stewart and the emails between Stewart and Woolford which demonstrate that Stewart, the Chief Hearing Officer, was herself confused about Townsend's appeal in IGO No. 2019-1074, which she mistakenly believed was an appeal of the May 9, 2019 ruling on the Ritchie NOIRV, a mistake which was reflected in her December 20, 2019

18

memorandum. She then wrote to Woolford on December 31, 2019, "Despite my mix up, [Townsend] accepted the resolution in the memo," which reflects that the explanation for the Notice of Withdrawal provided to Townsend was likely the explanation provided in her memorandum—that the sanctions on the Ritchie NOIRV were being reversed. J.A. 616.

Where the prison officials were clearly confused about IGO No. 2019-1074, to the point that Stewart issued a memorandum with inaccurate information, it is entirely plausible that Logsdon misrepresented, even if unintentionally, the import of the Notice of Withdrawal to Townsend. Thus, there is, at a minimum, a genuine issue of material fact on whether prison officials thwarted his ability to complete the appeal process based on a misrepresentation. The Court therefore cannot conclude as a matter of law that Defendants are entitled to summary judgment on the due process claim based on a failure to exhaust administrative remedies.

In turn, and for similar reasons, the Court also will not grant summary judgment on the due process claim based on Defendants' related argument under *Hudson v. Palmer*, 468 U.S. 517, 533 (1984), that Townsend's due process claim fails because he had a "meaningful post-deprivation remedy" that he failed to pursue when he withdrew his appeal. Mot. Summ. J. at 27, ECF No. 83-1.

## III.    Excessive Force

On the merits, Defendants argue that the record does not provide sufficient evidence to support a finding in favor of Townsend on his claim of excessive force in violation of the Eighth Amendment right to be free from cruel and unusual punishment. The Eighth Amendment is violated when an inmate is subjected to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To establish an Eighth Amendment violation based on a use of force, an inmate must show both that

(1) the injury or deprivation inflicted was objectively serious enough to constitute a violation; and (2) the prison official subjectively "acted with a sufficiently culpable state of mind." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

On the objective element, a party asserting an Eighth Amendment excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (per curiam). "[N]ot 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* at 37 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). However, an Eighth Amendment violation can occur even if a correctional officer's actions did not cause serious injury. *Id.* at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.") "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The extent to which injuries are modest is accounted for in the award of damages. *See Wilkins*, 559 U.S. at 40.

On the subjective element, an inmate must show that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm" and thus "inflicted unnecessary and wanton pain and suffering," rather than acting "in a good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In assessing this element, a court should consider "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat;" and "(4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 321).

### A.     Physical Force

On Townsend's claim that Defendants violated the Eighth Amendment by engaging in a physical beating of him on April 28, 2019 in the area inside Door No. 430A near the strip cage, the Court finds that there remain genuine issues of material fact that preclude summary judgment at this time. Townsend has stated in a declaration that during that incident, he was beaten without justification. Specifically, he asserts that once he entered Housing Unit 4, in the area not covered by surveillance video cameras, Most pushed his face against the wall, Ritchie punched him, then Ritchie, Most, Connell, Brooks, and Carr punched and kicked him multiple times in his sides, back, and stomach, both in the corridor and then after they dragged him into the property room. According to Townsend, Frenzel slammed his head against the back of the wall of the strip cage, and Buterbaugh "emptied his fogger of pepper spray in [Townsend's] face." J.A. 643. Particularly where Townsend was undisputedly handcuffed throughout this encounter, these facts, if true, would demonstrate both an objective injury and the subjective intent of acting maliciously to cause harm that would support a finding of an Eighth Amendment violation based on excessive force.

Defendants argue that the accounts of the various correctional officers, and the lack of significant injuries or other corroboration of Townsend's account, so outweigh Townsend's testimony that no reasonable juror could find in favor of Townsend. On a motion for summary judgment, however, the Court must view the evidence in the light most favorable to Townsend. First, although Townsend did not sustain major injuries, and the x-ray taken in June 2019 did not reveal any fracture to his ribs, his account is not without corroboration. The evidence demonstrates that Townsend had pain in his rib cage area following the April 28, 2019 incident. Not only did Townsend contemporaneously assert that he had such pain in his medical visits, his sick call requests, and his ARPs, his cellmate, Donald Rivers, submitted a declaration stating that from the

21

time they became cellmates on May 1, 2019 and for some time after, he observed that "it was obvious that [Townsend] was injured and in pain" from the fact that he took "short, gasping breaths when trying to speak" and that he "grabb[ed] his left rib cage" and "winc[ed] when he moved around." J.A. 647–48. Moreover, even though the nurses did not detect specific indicators of a rib injury during their examinations, Townsend's medical records from the months following the incident show that he had an unexplained mass in his left rib area which could have been a hematoma, a severe bruise that causes blood to pool and collect under the skin. In the absence of evidence of another cause, it would be reasonable to infer that this minor injury could have been the result of the beating described by Townsend.

Moreover, although the testimony of the correctional officers collectively can be construed as disputing Townsend's account, it contains inconsistencies and gaps that limit its persuasiveness as conclusive evidence on this issue. For example, Ritchie, Most, and Connell each testified in their depositions that Townsend was not resisting physically as they escorted him to Housing Unit 4, and that they all left the area without incident after turning Townsend over to Housing Unit 4 officers, with Ritchie and Most both denying that Most held Townsend up against the wall. Henry, however, testified that while he was in the property room he received a radio call stating that the inmate being brought to Housing Unit 4 was "bucking," meaning that he was throwing his body left and right and trying to pull away from officers. J.A. 168–69. He also testified that when he first saw Townsend, Townsend was yelling and jerking left to right and trying to get away, three or four officers were holding Townsend against the wall, and Ritchie was present. Although Henry testified that he, Frenzel, and Buterbaugh helped "secure [Townsend] against the wall" and then escort him to the strip cage, both Frenzel and Buterbaugh testified that they do not remember if Townsend was ever pushed against a wall. J.A. 174. Indeed, Buterbaugh testified that he did not

22

remember "anything" about the events on April 28, including whether Most held Townsend against the wall, whether Ritchie or Frenzel punched or struck Townsend, and even whether he was kicked by Townsend or used pepper spray on Townsend. J.A. 238.

Finally, the Court notes that the lack of any surveillance video footage hinders the ability to grant summary judgment at this time. It is undisputed that no surveillance video cameras cover the corridor and property room in which the beating allegedly took place, a fact which at least one officer acknowledged to be common knowledge and which Townsend asserts was the reason that the attack occurred where it did. WCI, however, failed to preserve other relevant footage, such as the footage that would show Townsend being escorted to Door No. 430A and when and how Ritchie, Most, and Connell left the area. Although Townsend requested in his ARP filed shortly after the incident occurred that the surveillance video footage be preserved, it was not. Thus, while such video evidence could have corroborated the officers' account, or that of Townsend, the absence of video footage that could eliminate genuine issues of material fact is another factor precluding summary judgment at this time.

Where there are genuine issues of material fact as to whether Defendants engaged in the beating described by Townsend, the Court concludes that summary judgment is not warranted.

**B.   Pepper Spray**

As for Buterbaugh's use of pepper spray on Townsend, the application of pepper spray may be part of a good faith effort to maintain or restore discipline, such as when it is needed to control recalcitrant inmates who ignore official commands. *See Williams*, 77 F.3d at 759, 763 (finding no Eighth Amendment violation where a correctional officer administered pepper spray after a prisoner had thrown water out of his cell's food slot as part of a protest and did not obey an order to remove his arm from the food slot). However, "it is a violation of the Eighth Amendment

23

for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Id.* at 763 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)). Indeed, "a sustained blast of pepper spray directly to the face constitutes something more than de minimis force" for purposes of the Eighth Amendment. *Dean v. Jones*, 984 F.3d 295, 303 (4th Cir. 2021).

Here, it is undisputed that Buterbaugh used pepper spray on Townsend while he was handcuffed. There are, however, genuine issues of material fact on whether Townsend was actually resisting the officers and whether his actions warranted the use of pepper spray to restore discipline, or whether it was used to cause harm or pain. As discussed above, regardless of whether the correctional officers engaged in a beating of Townsend, he has denied physically resisting the officers. Notably, none of the officers who escorted him from Housing Unit 2 has claimed that he resisted physically. While Henry has testified that when he arrived on the scene Townsend was resisting physically and was being held up against a wall, and that Townsend kicked Buterbaugh, the other correctional officers provide little if any corroboration of this account. As discussed above, Buterbaugh testified that he did not remember "anything" about the events on April 28, 2019, including whether he was kicked by Townsend or even whether he used pepper spray on Townsend. J.A. 238. Although Frenzel generally testified that Townsend was "fighting all of us," J.A. 130, and that he, Townsend, and other officers fell to the floor, he also testified that the fall may have been because someone tripped rather than because Townsend was pulling away from them. Notably, in his deposition, Frenzel did not reaffirm claims in his Answers to Interrogatories that Townsend had kicked Buterbaugh and may have been trying to bite Buterbaugh and instead testified that he did not remember whether Townsend kicked Buterbaugh or tried to bite him, or even whether Buterbaugh used pepper spray on Townsend. Both Brooks and Carr testified that

they arrived only after Townsend was in the strip cage and could see that he had been pepper sprayed, but they witnessed no physical resistance by Townsend.

Thus, the evidence that Townsend was resisting or engaged in an assault that justified the use of pepper spray is not as substantial as claimed. Particularly where Townsend was handcuffed, there remain genuine issues of material fact on whether any such resistance was sufficiently severe that pepper spray was necessary to restore discipline. *See, e.g.*, *Dean*, 984 F.3d at 301, 304, 306 (finding that summary judgment on an inmate's Eight Amendment claim was unwarranted where pepper spray was deployed against handcuffed inmate). Notably, based on their deposition testimony, none of the correctional officer defendants has ever used pepper spray on a handcuffed inmate, except for one who once directed pepper spray on a nearby inmate who was about to harm the handcuffed inmate. Thus, viewing the evidence in light most favorable to Townsend, there remains a genuine issue of material fact on whether Townsend's conduct warranted the use of pepper spray in the amount used to restore discipline, or whether it was used maliciously to cause pain. The Court will therefore deny the Motion as to the excessive force claims.

## IV.    Failure to Provide Medical Care

On the claim that Benson and Smith violated the Eighth Amendment by acting with deliberate indifference to a serious medical need when they failed to arrange for Townsend to see a medical provider while he was on staff alert status, the Court has found that this claim fails because Townsend did not exhaust administrative remedies. In the alternative, the Court also finds that the evidence is insufficient to sustain this claim. For an Eighth Amendment claim based on a failure to provide medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106. Such deliberate indifference requires proof that, objectively, the prisoner plaintiff was

25

suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure that the needed care was available. *See Iko*, 535 F.3d at 241.

Objectively, the medical condition at issue must be serious in that it "has been diagnosed by a physician as mandating treatment" or is one that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* "Deliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Moreover, even if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

As to the objective prong, there is not sufficient evidence to support the conclusion that Townsend had an objectively serious medical need. Although there is a factual dispute over whether the nurse who examined him immediately after the April 28, 2019 incident lifted his shirt to directly examine his torso, the medical records demonstrate that the nurse identified no specific

26

injuries and checked and determined that his breath sounded clear. Significantly, the medical records from Townsend's additional examinations on May 9, 2019 and May 22, 2019 reveal that Townsend was able to get on and off the examination table without signs of discomfort, that there were no outward signs of injury, bruising, or swelling, and that he did not require any specific treatment at that time. The June 14, 2019 x-ray, which was reviewed by a physician, established that he had no broken ribs. Although Townsend points to a June 21, 2019 nurse's report that appears to state the x-ray showed a broken rib, J.A. 378, that report was clearly in error, since a second doctor and another nurse later confirmed that the x-ray showed that there was no fracture.

Viewing the evidence in the light most favorable to Townsend, the objective evidence establishes at most that he had painful bruising to his rib cage area. This conclusion is corroborated in part by the later examinations, which showed a possible hematoma in his left rib cage area. This injury, though painful, does not establish an objectively "serious . . . medical need that . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Indeed, Townsend has not identified any particular treatment that should have been provided during the period he was on staff alert status or at any later point.

Even if Townsend could establish that his rib pain constituted an objectively serious medical need, there is insufficient evidence to show that Benson and Smith subjectively knew of and disregarded an excessive risk to Townsend's health and safety. Townsend asserts in his declaration that he repeatedly told both Benson and Smith that he was in extreme pain, that he was visibly in pain, and that he asked for assistance in getting medical care, claims which Benson and Smith have denied. Notably, in his ARPs, Townsend complained about the inaction of the nurses and medical staff, not Benson or Smith, and in fact stated that on one occasion, on May 9, 2019,

27

he requested that Smith ask the nurse about getting him medical care, and Smith relayed the message and reported back that the nurse had not received any sick call requests from him. Where the evidence shows that Townsend did not suffer any fracture to his ribs, and did not end up requiring any particular treatment, the Court does not find that these limited facts can establish, without more, that Benson and Smith actually knew of an excessive risk to Townsend's health that would result from the absence of immediate medical treatment.

Further, the record evidence does not provide facts that would support an inference of a subjective intent to disregard such a risk. Although Townsend alleged in the Amended Complaint that Smith threatened to take Townsend into a blind spot and beat him up, an allegation which the Court relied upon in denying the Motion to Dismiss in *Townsend I* as potentially supporting a finding of deliberate indifference, *see Townsend I*, 2021 WL 1893193, at *9, at this stage there is no evidence in the record, such as in Townsend's declaration or deposition testimony, that Smith made this statement. In any event, this statement was allegedly made on May 13, 2019, almost two weeks after Townsend's staff alert status, so it came well after the alleged denial of medical care at issue in Count 2. Townsend makes no further claims about interactions with Benson.

Where the record does not support the conclusions that Townsend had an objectively serious medical need and that Benson and Smith knew that the failure to provide immediate medical care while he was on staff alert status would pose an excessive risk to Townsend's health and yet disregarded that risk, the Court finds that the Motion will be granted as to Townsend's medical care claim on the merits.

## V.    Due Process

In Count 3, Townsend argues that his due process rights were violated when he was sanctioned pursuant to the Buterbaugh NOIRV with the loss of 60 days of good conduct credits at

the May 22, 2019 hearing at which he was not present. Defendants seek summary judgment on this claim based on a form submitted at the May 22, 2019 hearing that purported to document Townsend's waiver of his right to appear at the hearing, while Townsend asserts that the waiver form, which he did not sign, provided false information, and that he did not appear because no correctional officer came to his cell to escort him to the hearing.

In prison disciplinary proceedings, when a prisoner faces the possible loss of good conduct credits, he is entitled to certain due process protections. *Wolff v. McDonnell*, 418 U.S. 539, 558, 563–64 (1974). The due process requirements include advanced written notice of the charges, a hearing at which the prisoner may be present, the right to call witnesses and present evidence at the hearing when doing so is not inconsistent with institutional safety and correctional goals, and a written decision. *Id*. at 564–66.

Here, there is a genuine dispute of material fact as to whether Townsend was deprived of his right to attend the hearing, or whether he waived that right. Although Farris's decision to hold the hearing *in absentia* was based on an Inmate Waiver of Appearance form, that form was not signed by Townsend. Rather, it was signed by Henry, one of the correctional officers involved in the April 28, 2019 incident, who stated in the form that he visited Townsend's cell at 9:00 a.m. on May 22, 2019, the date of the hearing, and that Townsend declined to go to the hearing and told him, "Do what you want. I don't care." J.A. 576. For his part, Townsend has stated in his declaration that he never waived his appearance.

Beyond the clear factual dispute on this point, Townsend's position is bolstered by the fact that, as he asserted in his declaration, he was taken to the medical unit for a sick call visit by a different correctional officer at 9:00 a.m. that day, waited for "at least half an hour," then was seen by a nurse at approximately 9:35 a.m., as reflected in his medical records. J.A. 644. Where after

29

all of Townsend's requests for a sick call visit, one was finally provided on the morning of the hearing, there is at least a fair question whether his non-appearance was based on an absence from his cell because of that appointment rather than an affirmative decision to waive his right to attend the hearing. Further, Townsend correctly notes that where he requested five witnesses for the hearing, and the original May 9, 2019 hearing on the Buterbaugh NOIRV was postponed because the witnesses were not available, he demonstrated a clear interest in having a contested hearing that is inconsistent with a decision to waive his appearance at the hearing. Finally, Defendants' position is undermined to a degree by the fact that based on their own deposition testimony, none of the five correctional officers Townsend requested as witnesses for his hearing—Ritchie, Frenzel, Buterbaugh, Brooks, and Carr—was ever informed about either the original May 9, 2019 hearing or the rescheduled May 22, 2019 hearing date, and none appeared on either hearing date. Had WCI truly planned to conduct a contested hearing on May 22, 2019 and held it *in absentia* only because Townsend waived his right to appear that morning, it stands to reason that those witnesses would have been previously notified and ready to appear that morning.

Where Townsend states that he never waived his appearance, his signature is not on the Inmate Waiver of Appearance Form, the timing of his medical visit coincides with both the hearing time and the alleged waiver of appearance, and none of his requested witnesses was ever notified that their testimony was requested, the Court finds that there is a genuine dispute of material fact on whether Townsend actually waived his right to appear. If he did not, the hearing may have violated his due process rights to appear at his hearing, to call witnesses, and to present evidence at the hearing. *Wolff*, 418 U.S. at 566. The Motion will therefore be denied as to the due process claim.

30

## VI.    Qualified Immunity

Finally, Defendants assert that they are entitled to qualified immunity from the claims in this case.  Government officials sued in their individual capacities may invoke the protection of qualified immunity to bar a claim for civil damages.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Henry v. Purnell*, 501 F.3d 374, 376–77 (4th Cir. 2007).  When qualified immunity is asserted, a court must consider two questions:  (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right; and (2) "whether the right was clearly established," that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Henry*, 501 F.3d at 377.  As in their previous dispositive motion, Defendants again merely cite general case law on the relevant standards without any meaningful analysis.  However, as the Court previously ruled in *Townsend I*, "the constitutional rights at issue—the Eighth Amendment right against excessive force against inmates, the Eighth Amendment right to be free from deliberate indifference to a serious medical need, and the Fourteenth Amendment due process right to a hearing before the imposition of discipline including the loss of good conduct credits—were clearly established at the time of the incidents at issue." *Townsend I*, 2021 WL 1893193, at \*9. As for whether Defendants' conduct violated these rights, as discussed above, there remain genuine issues of material fact in relation to the excessive force and due process claims that preclude summary judgment at this time. *See supra* parts III, V.  Accordingly, qualified immunity does not provide a basis to grant the Motion.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 83, will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to Count 2, the Eighth Amendment claim for deliberate indifference to a serious medical need against Sgt. Floyd Benson and Lt. James Smith, who will be dismissed as defendants in this case. The Motion will be otherwise denied. A separate Order shall issue.

Date:   August 8, 2023

THEODORE D. CHUANG
United States District Judge